van Gestel, J.
This matter is before the Court on the request of the plaintiff, Transkaryotic Therapies, Inc. (“TKT”), for preliminary injunctive relief against the defendants Bain & Company, Inc. (“Bain”) and Laurie Eleanor J. Herriman, M.D. (“Herriman”).
BACKGROUND
TKT is a biopharmaceutical company developing protein-based and cell-based therapeutics for the treatment of a wide range of diseases.
Bain is a Massachusetts corporation that describes itself as being engaged in the business of converting “strategy and action into economic performance.” Herriman is a physician employed by Bain in some form of consultant capacity.
At the present time, TKT is involved in conducting clinical trials of one of its products, Replagal, in a variety of patient populations, including .affected females and kidney transplant recipients. These studies are designed to provide further insight into Replagal as a treatment for Fabry disease, to support regulatory filings around the world, and to expand Replagal in countries where it is already approved.
Replagal is an enzyme replacement therapy for long-term treatment of patients with Fabry disease, which is a lysosomal storage disease resulting in extreme pain in the extremities, hearing loss, kidney failure, heart disease and stroke. Patients suffering from Fabry disease generally die around the age of 40.
TKT has been granted marketing authorization for Replagal in the fifteen countries of the European Union, as well as Norway, Iceland, New Zealand, Israel, Switzerland and The Czech Republic.
TKT’s only competition in the development of therapies to fight Fabry disease is a product called Fabrazyme produced by Genzyme Corporation (“Genzyme”). Both TKT and Genzyme have been granted competing co-orphan drug exclusivity in the European Union for a period of up to ten years. No companies other than TKT and Genzyme are known to be testing or selling a protein product to treat Fabry disease.
It is principally to obtain marketing authorization from the United States Food and Drug Administration (“FDA”) that TKT is conducting the present clinical trials. Genzyme is also seeking such FDA approval through clinical trials of its own. The situation is highly competitive, with huge amounts of money and prestige at stake. For example, annual sales for such a drug in the worldwide market are estimated to exceed $500 million. The two companies are in a high-stakes war to see who can get to the United States market first.
Clinical trials are performed by a small number of highly qualified investigators at specified sites in strict compliance with a clinical protocol and all applicable laws, regulations and guidelines, good clinical practices, and the quality standards required by the FDA. These clinical trials are highly confidential endeavors, and each employee at the clinical trial site is bound to explicit written confidentiality and non-disclosure agreements.
TKT has learned that Herriman, on behalf of Bain’s client Genzyme, has recently been in contact with TKT’s principal investigator in its clinical trials. Dr. William J. Rhead at The Medical College of Wisconsin, inquiring about the progress and other matters relating to the TKT clinical studies on Replagal. Attached to the complaint is a copy of a February 8,2002, e-mail from Herriman to Dr. Rhead revealing that she previously had been in contact with him, asking additional questions about the Replagal studies and reporting that Dr. Rhead’s “honorarium should be ready in the next two weeks.”
TKT seeks to protect its confidential information regarding the clinical studies, which it characterizes as trade secrets.
Bain’s opposition readily concedes that Herriman, “a Bain employee,” has been in contact with Dr. Rhead in order to “provide strategic advice, and to gather data” regarding TKT’s trials to and for Genzyme. Bain contends, however, that it has done so by “above board” means.
Bain describes the e-mail attached to TKT’s complaint as “a single, incomplete shred of evidence about Bain’s contacts with one of TKT’s clinical investigators.” Bain insists that the investigator — Dr. Rhead— "simply advised Bain that there was certain *398 information he could not discuss because it was covered by a nondisclosure agreement with TKT." A complete recitation of Dr. Rhead’s response reads:
NO TO [QUESTION] 1, AND I BELIEVE THAT THE CONFIDENTIALITY IN CONTRACT I’VE SIGNED WITH TKT FORBIDS ME TO ANSWER THE QUESTIONS BELOW; SORRY, BUT PLS FEEL FREE TO CALL ME NEXT WEEK IF YOU WISH TO DISCUSS THIS FURTHER.
On the subject of “honorariums,” Bain says that “[i]n the course of its information gathering, Bain offered honorariums intended to compensate for time spent talking to Bain. The amounts paid ranged between $150 and $250 (two sources received total honorariums of $500, reflecting two interviews).” Bain claims that “such modest honorariums are a common practice in information gathering.” Bain says that Dr. Rhead’s honorarium was $250, and at his request it will be donated to the Children’s Hospital of Wisconsin in his name.
This Court is not surprised at TKT’s concern that Bain, on behalf of TKT’s sole competitor, has been/-5 contacting its lead investigator on the all-important clinical trials, hopefully leading to FDA approval, and is paying him .money for the cdmmunication.
Through an affidavit from Genzyme, Bain complains tfíat TKT may well be doing its own information gathering, complete with a Bain clone and honoraria similar in kind to that proffered by Bain’s Dr. Herriman.[1]
Bain complains that the injunction sought by TKT is far too broad. While arguing that no injunction is warranted, however, Bain has offered: (1) to preserve the information collected; (2) to refrain from further communications with TKT’s clinical investigators; and (3) to refrain from disclosing confidential information obtained from TKT’s clinical investigators.
DISCUSSION
In order to prevail on a request for preliminary injunctive relief, whether it be to protect a trade secret or to enforce a non-disclosure agreement covering confidential information, TKT bears the burden of showing: (1) its likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunctive relief sought is not granted; and (3) that its harm, without the injunction, outweighs any harm to Bain and Herriman by being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
“When ... a party seeks to enjoin governmental action, the [C]ourt also considers whether the relief sought will adversely affect the public." Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001). See also Commonwealth v. Mass. CRINC, 392 Mass. 443, 447 (1983); Biotti v. Board of Selectmen of Manchester, 25 Mass.App.Ct. 637, 640 (1988). Here, of course, it is not governmental action that is sought to be enjoined, but the information involved is certainly part of a process in which the government, through the FDA, is deeply involved and in which the public — particularly those suffering from Fabry disease — has a significant interest.
The granting or denial of preliminary injunctive relief is a matter within the sound discretion of the Court. Tri-Nel Management, Inc., 433 Mass. at 219.
It seems worth noting that by statute in Massachusetts, G.L.c. 93, Sec. 42A, an entity is entitled to injunctive relief for misappropriation of its trade secrets. Indeed, by G.L.c. 266, Sec. 30, such a misappropriation could be a crime. A “trade secret" is defined in c. 266, Sec. 30, as “anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement.” It does not seem too much of a leap to conclude that the confidential part of the clinical trials in issue fall within that statutory reach,
FürtJtS?, confidential information, even if not truly a trade* secret, and even if there is no ascertainable damage, is entitled to protection by injunction. See, e.g., Warner-Lambert Company v. Execuquest Corporation, 427 Mass. 46, 50 (1998); Middlesex Neurological Assoc., Inc. v. Cohen, 3 Mass.App.Ct. 126, 132 (1975).
This Court is of the belief that the granting of a preliminary injunction is warranted in the circumstances before it. The Court is comfortable that TKT has demonstrated a reasonable likelihood of success on the merits, that it will suffer irreparable harm in the absence of protection, and that the balance of harms between TKT, on the one hand, and Bain and Herriman, on the other, falls squarely in TKT’s favor.
PRELIMINARY INJUNCTION
For the reasons set forth above, this Court hereby issues a preliminary injunction enjoining the defendants Bain & Company, Inc. and Laurie Eleanor J. Herriman, M.D., and their officers, agents, attorneys, servants and employees, as well as any persons, firms or entities in active concert or participation with them, in connection with the plaintiffs clinical trials for Replagal, who receive actual notice of this injunction, from:
1. Destroying any and all documents and communications of any kind whatsoever, including e-mails and other electronic forms of information, concerning the plaintiffs clinical trials for Replagal and failing to preserve all such documents and communications for discovery during the course of this litigation;
2. Communicating with any of the plaintiffs known clinical investigators, or their agents, servants and employees, or any other persons known to be work *399 ing with or assisting such investigation concerning the clinical trials for Replagal; and
3. Without first obtaining the written approval of TKT, or from the Court or its appointed Master, disclosing to anyone any and all data or information concerning the plaintiffs clinical trials for Replagal that the defendants have obtained from any of the plaintiffs clinical investigators or from any other source known to the defendants to be subject to confidentiality agreements.
This injunction shall remain in full force and effect unless and until further order of this or any appropriate appellate court.

 indeed, Genzyme’s counsel was present at the hearing and, although declining to subject his client to party status, took the opportunity to argue, with considerable vigor, that TKT did exactly the same thing regarding Genzyme as Genzyme was doing regarding TKT. Either they are both saints or both sinners. Who is getting the sauce, the goose or the gander? But only one of them is before the Court; and the other is not even named as a party.